GIPSON HOFFMAN & PANCIONE
A Professional Corporation
DANIEL R. PALUCH (State Bar No. 287231)
*dpaluch@ghplaw.com*
1901 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-6002
Telephone: (310) 556-4660
Facsimile: (310) 556-8945

Attorneys for Plaintiffs and Class Members

*(Additional counsel listed on following page)*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOAH POLLAK, on behalf of all others similarly situated, and STANDWITHUS CENTER FOR LEGAL JUSTICE,<br><br>Plaintiffs,<br><br>v.<br><br>CODEPINK WOMEN FOR PEACE, a California entity; CODEPINK ACTION FUND, a California entity; WESPAC FOUNDATION, a New York entity; HONOR THE EARTH, a Minnesota entity; COURTNEY LENNA SCHIRF; REMO IBRAHIM, d/b/a PALESTINIAN YOUTH MOVEMENT; PALESTINIAN YOUTH MOVEMENT; and DOES #1-100,<br><br>Defendants. | Case No.: 2:24cv6253<br><br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1

1473889.10 - 06297.00001

1  Mark Goldfeder (*Pro Hac Vice*)
2  *mark@jewishadvocacycenter.org*
   Ben Schlager (*Pro Hac Vice*)
3  *ben@jewishadvocacycenter.org*
   NATIONAL JEWISH ADVOCACY CENTER, INC.
4  INTERNATIONAL LEGAL FORUM
   1718 General George Patton Drive
5  Brentwood, TN 37027
   (800) 269-9895 (telephone)
6  (800) 758-5232 (facsimile)
7
   Jason B. Torchinsky (*Pro Hac Vice*)
8  *jtorchinsky@holtzmanvogel.com*
   Edward M. Wenger (*Pro Hac Vice*)
9  *emwenger@holtzmanvogel.com*
   Erielle Davidson (*Pro Hac Vice*)
10 *edavidson@holtzmanvogel.com*
   HOLTZMAN VOGEL BARAN
11 TORCHINSKY & JOSEFIAK, PLLC
   2300 N Street NW
12 Suite 643
   Washington, DC 20037
13 (202) 737-8808 (telephone)
14 (540) 341-8809 (facsimile)
15
16 John Cycon (*Pro Hac Vice*)
   *jcycon@holtzmanvogel.com*
17 HOLTZMAN VOGEL BARAN
   TORCHINSKY & JOSEFIAK, PLLC
18 15405 John Marshall Highway
   Haymarket, VA 20169
19 (540) 341-8808 (telephone)
20 (540) 341-8809 (facsimile)
21
   Dallin Holt (*Pro Hac Vice*)
22 *dholt@holtzmanvogel.com*
   HOLTZMAN VOGEL BARAN
23 TORCHINSKY & JOSEFIAK, PLLC
   2555 East Camelback Rd, Ste 700
24 Phoenix, AZ 85016
   (602) 388-1262 (telephone)
25 (540) 341-8809 (facsimile)
26
27
28

2

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

## INTRODUCTION

1.     Bear-sprayed congregants. Jews assaulted, intimidated, and threatened. Bloodied members of the Jewish community who wished only to exercise their First Amendment right of religious freedom at a place of worship.

2.     The images that emerged from the antisemitic riot outside the Adas Torah Synagogue (the "Synagogue") on June 23, 2024, shock the conscience.

3.     But even in 2024, in the United States, those images are no longer surprising.

4.     Instead, they are emblematic of an increasingly common occurrence: organized riots that violently target the American Jewish community.

5.     On June 23, 2024, the Named Defendants (all Defendants, excluding Does #1-100) incited scores of individuals (including Does #1-100) to terrorize Jewish congregants outside their Synagogue.

6.     The rioters blocked access for some congregants, trapped others inside, and attempted to intimidate all of them.

7.     Outside, some in the mob (including Does #1-100) bear sprayed and attacked Jewish congregants and others present.

8.     The attack was organized, publicized, aided, and (on information and belief) funded by Defendants CodePink Women for Peace and Palestinian Youth Movement ("PYM") (two organizations that seek to destroy the Jewish State of Israel), as well as by Defendant Courtney Lennar Schirf (a PYM organizer) and

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.0000

Defendant Remo Ibrahim (an organizer for PYM's local chapter).

9.    Working collectively, the Named Defendants conspired with each other and then acted in concert to deprive Plaintiff Pollak, members of Plaintiff StandWithUs Center for Legal Justice ("SCLJ"), and members of the Proposed Class of their federally guaranteed rights, privileges, and immunities. *See* 42 U.S.C. § 1985(3).

10.    As a result, a violent mob, including Does #1-100, used violence, intimidation, and threats to prevent Jewish people from accessing the Synagogue.

11.    This violence forcibly halted at least one prayer service and multiple religious study sessions.

12.    Plaintiff Pollak, for instance, tried to enter the Synagogue through the front entrance, but he was blocked by the angry mob, most of whom donned matching keffiyehs to hide their identities.

13.    The rioters stood shoulder-to-shoulder, screeching antisemitic slurs and brandishing weapons.

14.    After fighting through the chaos, Plaintiff Pollack was forced to enter the Synagogue through a side entrance.

15.    Defendants' violent riot also prevented a number of individuals, including members of Plaintiff SCLJ and the Proposed Class, from attending an event that was supposed to involve prayer and educate Jewish congregants about housing opportunities in Israel, which would fulfill their religious commandment to

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

emigrate to Israel.

16.     Upon seeing or being notified of Defendants' riot, other members of the Proposed Class were intimidated from even approaching the Synagogue and were effectively forced from exercising their First Amendment right of religious freedom out of fear for their physical safety, since passage to and from the Synagogue was rendered unreasonably difficult or hazardous.

17.     These hazards arose not only from the physical blockade, but also from the decision of the rioters to brandish weapons and perpetuate violence, all while spewing racial and antisemitic slurs.

18.     Years ago, Congress recognized that this type of conduct is repugnant.

19.     Accordingly, it created a statutory mechanism to hold accountable those who prevent individuals from exercising their First Amendment right of religious freedom.

20.     Specifically, the Freedom of Access to Clinic Entrances Act (the "FACE Act"), 18 U.S.C. § 248, ensures that individuals may practice their respective religions free from persecution, interference, and intimidation.

21.     Additionally, since Reconstruction, Section 1985 of the Ku Klux Klan Act has prohibited the sort of conspiracy to violate civil rights in which the Named Defendants engaged.

22.     Having violated these statutes, Defendants are liable for damages (including punitive damages), and Plaintiffs are entitled to injunctive relief to

5

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

1    prevent Defendants from again perpetuating similar transgressions.

2                        **JURISDICTION AND VENUE**

3

4        23.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, which

5    confer original jurisdiction on federal district courts to hear suits alleging the

6    violation of rights and privileges under acts of Congress.

7

8        24.    This action arises because Defendants deprived Plaintiff Pollak, the

9    Proposed Class Members, and the SCLJ Members of their rights under the FACE

10   Act, 18 U.S.C. § 248, which prohibits the actual or attempted physical obstruction,

11   intentional injury, intimidation, or interference with any person lawfully exercising

12   their First Amendment right of religious freedom. *Id.* § 248(a)(2).

13

14       25.    For purposes of the FACE Act, the term "physical obstruction" not

15   only means rendering impassable ingress to or egress from a place of religious

16   worship, but also expressly covers situations in which passage to or from a place of

17   religious worship was rendered unreasonably difficult or hazardous, even if a FACE

18   Act plaintiff eventually succeeded in entering or exiting a place of religious

19   worship. *Id.* § 248(e)(4).

20

21       26.    The FACE Act also provides civil remedies and a cause of action for

22   "[a]ny person aggrieved by reason of the conduct prohibited by subsection (a)." *Id.*

23   § 248(c)(1)(A).

24

25       27.    Named Defendants also deprived Plaintiffs of their civil rights,

26   protected by 42 U.S.C. § 1985(c), which provides that any "party so injured or

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

deprived" of their civil rights by virtue of a conspiracy "may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

28.     Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiff Pollak's, Proposed Class Members', and SCLJ Members' claims occurred in the Pico-Robertson neighborhood of Los Angeles, California, which is in this District.

## PARTIES

### A.     The Plaintiffs.

29.     Plaintiff Noah Pollak is a resident of Los Angeles, California, and is the named representative for the Proposed Class.

30.     Plaintiff StandWithUs Center for Legal Justice ("SCLJ") is a tax-exempt membership organization incorporated under the laws of California.

31.     SCLJ has members from communities across the Country, including Jewish and Israeli individuals who share SCLJ's dedication to combating antisemitism through legal action.

32.     SCLJ includes congregants from the Synagogue and members of the Los Angeles Jewish community who tried to attend services at the Synagogue on June 23, 2024.

33.     SCLJ Member #1 is a Jewish resident of Los Angeles who sought to attend a religious event at the Synagogue at the time of the riot.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

34.    SCLJ Member #2 is a Jewish resident of Los Angeles who sought to attend a religious event at the Synagogue at the time of the riot.

35.    SCLJ Member #3 is a Jewish resident of Los Angeles who sought to attend a religious event at the Synagogue at the time of the riot.

36.    SCLJ Member #4 is a Jewish resident of Los Angeles who sought to attend a religious event at the Synagogue at the time of the riot.

37.    SCLJ Member #5 is a Jewish resident of Los Angeles who sought to attend a religious event at the Synagogue at the time of the riot.

38.    SCLJ Member #6 is a Jewish resident of Los Angeles, as well as a member of the Synagogue, who was studying Torah at the Synagogue at the time of the riot.

39.    SCLJ Member #7 is a Jewish resident of Los Angeles, as well as a member of the Synagogue, who sought to attend the afternoon prayer services at the time of the riot.

**B.    The Defendants Who Organized the Riot.**

40.    Defendant CodePink Women for Peace ("CodePink") is a registered California entity and a Section 501(c)(3) non-profit organization that supports the terrorist organization Hamas and opposes the State of Israel.

41.    CodePink is headquartered in Marina Del Rey, California.

42.    CodePink describes itself as a "feminist grassroots organization working to end U.S. warfare and imperialism, support peace and human rights

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

initiatives, and redirect resources into healthcare, education, green jobs and other life-affirming[] programs."[1]

43.    Contrary to that description, CodePink has long supported terrorists and terrorist entities, including Iran, the largest state-sponsor of terror; Ansar Allah (also known as the "Houthis"),[2] which was previously designated a Foreign Terrorist Organization; and Hamas.[3]

44.    Each of these terrorist entities has called for the annihilation of the Jewish people.

45.    Members of CodePink have attended a conference in Iran with Holocaust deniers, and they have met with Hamas officials "several times."[4]

---

[1] *What is CODEPINK?*, CODEPINK, https://www.codepink.org/about (last visited Dec. 18, 2024).

[2] Haley Strac, *Another Defense of Terrorism from Code Pink*, NAT'L REVIEW (Jan. 16, 2024), https://www.nationalreview.com/corner/another-defense-of-terrorism-from-code-pink/.

[3] CODEPINK Staff, *CODEPINK Women Travel To Gaza TODAY To Witness Damage And Demand A Lifting Of The Blockade; Plan To Meet With Women's Groups, Hamas Officials*, CODEPINK (Jan. 29, 2009), https://www.codepink.org/official_release_codepink_women_travel_to_gaza_today_to_witness_damage_and_demand_a_lifting_of_the_blockade_plan_to_meet_with_women_s_groups_hamas_officials.

[4] James Reinl, *Hard-Left Activists Code Pink's History Of Israel-Bashing Revealed: Anti-War Feminist Group That's Under Congressional Scrutiny Over Ties To Chinese Communist Party Has A Record Of Links To Iran, Hamas And 'Antisemitism'*, DAILY MAIL (Dec. 23, 2023, 7:11 AM), https://www.dailymail.co.uk/news/article-12797043/Codepink-antisemitic-left-war-congress-Iran-Hamas-Israel.html.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

46.     Upon information and belief, members of CodePink were among those who physically obstructed Plaintiff Pollak, Proposed Class Members, and SCLJ Members from accessing the Synagogue on June 23, 2024.

47.     Defendant CodePink Action Fund ("CodePink Fund") is a registered California entity and Section 501(c)(4) non-profit organization that works hand-in-glove with CodePink.

48.     CodePink Fund shares a headquarters and leadership with CodePink.

49.     Defendant PYM, including local chapters such as PYM for Los Angeles, Orange County, and the Inland Empire ("PYM LA-OC-IE"), is an unincorporated association without a formal principal place of business or publicly identified leadership structure.

50.     That is by design.

51.     By avoiding such formalities and relying on fiscal sponsors such as WESPAC and Honor the Earth for fundraising and administrative support, *see infra* ¶¶ 96-154, PYM is better able to avoid accountability for its actions.

52.     Nominally, PYM is an anti-Israel movement established to advocate for Palestinian liberation.

53.     But in reality, PYM justifies terror attacks against Jews and has expressed public support for members of U.S.-designated Foreign Terrorist Organizations.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00001

54.     PYM's latest campaign of terrorizing Jews outside the Synagogue mirrors its previous activities.

55.     For instance, PYM recently helped organize a conference, titled the People's Conference for Palestine (the "Conference"), which involved multiple speakers who are affiliated with Foreign Terrorist Organizations.

56.     One such speaker was Sana Daqqah, the Conference's keynote speaker and wife of Walid Daqqah, a Popular Front for the Liberation of Palestine terrorist convicted of the kidnapping, torture, and murder of Israeli Moshe Tamam.[5]

57.     One PYM organizer at the Conference, Sarah Abdelshamy, celebrated the terror attacks of October 7, 2023, while speaking on a panel: "In the past eight months, we've seen incredible images of victory—from witnessing the families of political prisoners reunite with, and embrace their loved ones for the first time in years—to scenes of our heroic people breaking down the siege that has suffocated the Gaza Strip for 17 years."[6]

58.     PYM often collaborates with the organization National Students for Justice in Palestine ("NSJP"), another of WESPAC's fiscal sponsorships, which is being sued in the wake of the October 7 attacks in the U.S. District Court for the

---

[5] Michael Starr, *Rashida Tlaib attends conference honoring terrorists, hosting terrorist speaker*, JERUSALEM POST (May 26, 2024), https://www.jpost.com/international/article-803703.

[6] *Id.*

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

11

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

Eastern District of Virginia for providing material support to Hamas and other Foreign Terrorist Organizations.[7]

59.    Upon information and belief, members of PYM were among those who blocked Plaintiff Pollak, Proposed Class Members, and SCLJ Members from accessing the Synagogue on June 23, 2024.

60.    PYM has historically operated as a fiscal sponsorship of WESPAC, meaning that WESPAC has collected and disbursed donations on PYM's behalf because PYM lacks tax-exempt status.[8] *See infra* ¶¶ 96-154.

61.    CodePink and PYM are fully aware that their protests often result in violence, arrests, and unlawful disruptions of government proceedings, roads, bridges, and city streets.

62.    In fact, their organizers openly state that disruption is their goal.

63.    As a result, these protests go beyond protected First Amendment activity; they are deliberate actions that flout the law and violate the rights of others, regularly leading to violence, intimidation, and arrests.

---

[7] *See* Complaint for Damages and Jury Trial Demand, *Parizer v. AJP Educational Foundation Inc.*, No. 1:24cv724 (E.D. Va.).

[8] *Palestinian Youth Movement Profile*, NGO MONITOR (June 2, 2024), https://www.ngo-monitor.org/ngos/palestinian-youth-movement/#:~:text=WESPAC%20Foundation%20serves%20as%20the,amounts%20disbursed%20for%20PYM%20activities.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

64.    Even after the violent events at Adas Torah, these organizations have continued to engage in disruptive behavior.

65.    Given their propensity for violence and chaos, CodePink protests commonly require protested entities to undertake additional security measures.

66.    For example, CodePink's June 7, 2024, protests at the White House "prompt[ed] additional security measures, including anti-scale fencing."[9]

67.    In May 2019, CodePink protesters occupied the Venezuelan embassy and engaged in "confrontation with actual Venezuelans."[10]

68.    In May 2023, a protest over a Ukraine book tour involving CodePink members turned violent, and CodePink was forced to condemn the violent protesters.[11]

69.    In July 2023, CodePink co-founder Jodie Evans was arrested for blocking the entrance to the U.S. Department of Justice.[12]

---

[9] Kanishka Singh, *Pro-Palestinian Protesters to Surround White House; Fencing Put Up*, *Reuters* (June 7, 2024), https://www.reuters.com/world/us/anti-war-activists-surround-white-house-protest-fencing-put-up-2024-06-07/.

[10] Petula Dvorak, *Code Pink Used the Venezuelan Embassy as an Anti-Trump Prop. Now the Show is Over*, *Washington Post* (May 16, 2019), https://www.washingtonpost.com/local/code-pink-used-the-venezuelan-embassy-as-an-anti-trump-prop-now-the-show-is-over/2019/05/16/9afe470c-77dd-11e9-b3f5-5673edf2d127_story.html.

[11] Code Pink, *CodePink Condemns the Violent Protesters at Medea Benjamin's Ukraine Book Tour Event in Minneapolis* (May 22, 2023), https://www.CodePink.org/statementonviolentattack.

[12] Code Pink, *CodePink's Co-Founder and Ben & Jerry's Co-Founder*

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

70.     In October 2023, CodePink boasted about its members being arrested for disrupting a Senate Appropriations Committee hearing.[13]

71.     In March 2024, a CodePink organizer was charged with felony vandalism after vandalizing Representative Nancy Pelosi's home.

72.     Rather than condemning the CodePink organizer, CodePink issued a press release condemning Representative Pelosi.[14]

73.     In March 2024, CodePink members disrupted an event at University of California-Berkeley featuring Chancellor Carol Christ and former Secretary of State Condoleezza Rice.[15]

74.     In April 2024, CodePink members berated Defense Secretary Lloyd Austin outside of a hearing for the House Appropriations Subcommittee on Defense, leading to the arrest of a CodePink member.[16]

_____

*Arrested for Blocking DOJ Entrance While Protesting US Government's Prosecution of Wikileaks Publisher Julian Assange* (July 6, 2023), https://www.CodePink.org/dojarrest.

[13] Code Pink, *Several CodePink Peace Activists Demanding a Ceasefire NOW in Gaza in Senate Hearing Arrested* (Oct. 31, 2023), https://www.CodePink.org/arrestedforceasefirenow.

[14] Code Pink, *San Francisco CodePink Organizer Booked on Felony Charges of "Vandalism" of Nancy Pelosi's Home* (Mar. 22, 2024), https://www.CodePink.org/cynthiadetained.

[15] Code Pink, *UC Berkeley Alumni and Students Disrupt Chancellor Carol Christ and Former Secretary of State Condoleezza Rice Event on Free Speech* (Apr. 2, 2024), https://www.CodePink.org/condoleezaberkley.

[16] Louis Casiano, *Code Pink Activist Disrupts Defense Secretary Austin Hearing; 'You Have Blood on Your Hands', Fox News* (Apr. 17, 2024),

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

75.    In June 2024, CodePink boasted about the arrest of its members for disrupting Kamala Harris's appearance on *Jimmy Kimmel Live* during live taping.[17]

76.    In July 2024, a member of CodePink assaulted Congressman Derrick Van Orden during a CodePink protest at the Republican National Convention.[18]

77.    In a statement posted on X, Congressman Van Orden wrote: "While standing in line to enter an event at the RNC today, I was assaulted by what appeared to be a member of the pro-Hamas group CodePink. A nearby police officer witnessed this assault and I understand they have been arrested."[19]

78.    In November 2024, CodePink operatives masqueraded as synagogue congregants and harassed CNN anchor Dana Bash while she was there to worship.

79.    Speaking about the event, Bash stated: "You came to a place of Jewish worship, stood on the Bhima, near the holy Torah scroll, and pretended to be

---

https://www.foxnews.com/politics/code-pink-activist-disrupts-defense-secretary-austin-hearing-you-have-blood-your-hands.

[17] Code Pink, *Peace Activists Assaulted and Forcibly Removed From Jimmy Kimmel Live Taping With Vice President Kamala Harris* (June 5, 2024), https://www.CodePink.org/kimmelkamaladisrupt.

[18] Lawrence Andrea, Rep. Derrick Van Orden Accuses Code Pink Anti-War Protester of Assault During RNC, Milwaukee Journal Sentinel (July 16, 2024), https://www.jsonline.com/story/news/politics/2024/07/16/derrick-van-orden-accuses-code-pink-protester-of-assault-during-rnc/74433544007/.

[19] Derrick Van Orden, *Tweet* (Jul. 16, 2024), https://x.com/derrickvanorden/status/1813339483015668095. CodePink later confirmed it was their Palestinian campaign organizer.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

congregants. You have no shame, no decency, and no clue what you're talking about."[20]

80.     After harassing Ms. Bash while she was attending religious services at her synagogue, CodePink bragged about having "confronted" her for the way she covers Code Pink's protests at CNN.[21]

81.     And earlier this month, CodePink boasted about having "19 Students and Community Members Arrested at University of Wisconsin Board of Regents Meeting" for disrupting the Board's official proceedings.[22]

82.     PYM engages in the same disruptive, violent behavior.

83.     In November 2023, PYM sponsored "Shut It Down for Palestine" protests across the Country, seeking to disrupt business and services nationwide.[23]

84.     In January 2024, PYM also played a central role in organizing and leading a large-scale protest across New York City that blocked important traffic

---

[20] Jon Levine, *Dana Bash Slams Anti-Israel Protester Who Confronted Her at Synagogue*, New York Post (Nov. 16, 2024), https://nypost.com/2024/11/16/media/dana-bash-slams-anti-israel-protester-who-confronted-her-at-synagogue/.

[21] Code Pink, Tweet (Nov. 15, 2024) https://x.com/codepink/status/1857581013737603516

[22] Code Pink, *19 Students and Community Members Arrested at University of Wisconsin Board of Regents Meeting* (Dec. 5, 2024), https://www.CodePink.org/uwregentsboardaction.

[23] Faygie Holt, *'Shut It Down for Palestine' Protests Planned for Cities Across America on Nov. 9*, JNS (Nov. 8, 2023), https://www.jns.org/shut-it-down-for-palestine-protests-planned-for-cities-across-america-on-nov-9/.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

routes during rush hour, including the Brooklyn Bridge, Manhattan Bridge, Williamsburg Bridge, and the Holland Tunnel.[24]

85.    The protests included over 1,000 protesters.

86.    Jamil Madbak, a PYM organizer, stated: "Our aim today was to clog the arteries of New York City to draw attention to the ongoing genocide of the Palestinian people and the people of Gaza."[25]

87.    In February 2024, about twenty protesters from PYM blocked traffic on the Golden Gate Bridge in San Francisco, according to the California Highway Patrol.

88.    In a press release, PYM acknowledged that its members blocked the traffic.[26]

---

[24] Alaa Elassar & Emma Tucker, *At Least 320 Pro-Palestinian Protesters Arrested After Blocking Traffic Across New York City Bridges to Demand Gaza Ceasefire*, CNN (Jan. 8, 2024, 8:35 PM), https://www.cnn.com/2024/01/08/us/palestine-protest-nyc-gaza-ceasefire/index.html.

[25] *Id.*

[26] Evan Symon, *Palestinian Youth Movement Protest Stops Traffic On Golden Gate Bridge*, CALIFORNIA GLOBE (Feb. 14, 2024), https://californiaglobe.com/fr/palestinian-youth-movement-protest-stops-traffic-on-golden-gate-bridge/.

17

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

89. In March 2024, PYM played a central role in organizing a mass protest in downtown Los Angeles, where thousands of demonstrators blocked Spring Street.[27]

90. Five arrests were made, and the event caused significant traffic disruption in one of the city's busiest areas.[28]

91. Defendant Courtney Lenna Schirf ("Schirf") is a lead organizer for PYM.

92. Schirf is a resident of Austin, Texas, and controls PYM's social media profiles.

93. Defendant Remo Ibrahim ("Ibrahim") is the head of the local chapter of PYM for Los Angeles, Orange County, and the Inland Empire.

94. Ibrahim is a resident of Mission Viejo, California.

95. Ibrahim has control over the local chapter of PYM's social media profiles.

**C.    The Fiscal Sponsors.**

---

[27] Karla Rendon & Anastassia Olmos, *Thousands of Pro-Palestine Protesters Block Downtown LA Streets to Call for Ceasefire*, NBC Los Angeles (Mar. 2, 2024, updated Mar. 3, 2024, 4:27 PM), https://www.nbclosangeles.com/news/local/thousands-of-pro-palestine-protesters-block-downtown-la-streets-to-call-for-ceasefire/3353517/.

[28] *Id.*

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

96.     Generally speaking, organizations that wish to conduct charitable activities, enjoy tax-exempt status, and accept tax-deductible donations must obtain tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. *See* 26 U.S.C. § 501(c)(3).

97.     Tax-exempt organizations within this category must be duly organized business entities under relevant state law and must operate exclusively for exempt purposes.

98.     They also are subject to certain limitations on their political activities and to certain transparency and financial-reporting requirements.

99.     For various reasons, a fledgling or established nonprofit group may not be able or wish to obtain official tax-exempt status.

100.    In such cases, many groups opt to proceed under a so-called "fiscal sponsorship" agreement with an established tax-exempt organization.

101.    Under a fiscal-sponsorship arrangement, an existing Section 501(c)(3) tax-exempt organization (the "Sponsor") assists the non-exempt organization (the "Project") by "permitting the Project to solicit and receive tax-deductible contributions or grants through the Sponsor that the Project could not receive on its own."[29]

---

[29] *Fiscal Sponsorship: An Alternative to Forming a Nonprofit 501(c)(3) Corporation*, PUB. COUNSEL, https://publiccounsel.org/wp-content/uploads/2021/12/Fiscal-Sponsorship-An-Alternative-To-Forming-a-

19

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

102.   The Sponsor typically accepts donations on behalf of the Project, holds them, and then uses them to pay the Project's expenses.

103.   While fiscal sponsorships are not mentioned in the Internal Revenue Code, they are permitted if the Sponsor does not violate the IRS's "strict policy against 'conduit' arrangements."[30]

104.   This policy against 'conduit' arrangements is implicated by fiscal sponsorships because, "[w]hen a donation is made by A to B, earmarked for C, it is in reality a donation from A to C, and if C is not exempt under section 501(c)(3), the gift is not a tax-deductible contribution."[31]

105.   To avoid this improper arrangement—which can "jeopardize [the Sponsor's] exemption under section 501(c)(3)"—the Sponsor must "retain[] control and discretion over use of the funds for section 501(c)(3) purposes."[32]

Corporation.pdf (July 2021).

[30] Gregory L. Colvin, *Fiscal Sponsorship: Six Ways to Do It Right—A Synopsis*, 7 EXEMPT ORG. TAX REV. 604, 605 (1993).

[31] *Id.* (citing *S.E. Thomason v. Comm'r of Internal Revenue*, 2 T.C. 441 (Tax Ct. 1943)); *see also* 1963 IRB LEXIS 26, *7–9, Rev. Rul. 63-252, 1963-2 C.B. 101 (I.R.S. July 1, 1963).

[32] *New York ex rel. Tzac, Inc. v. New Isr. Fund*, 520 F. Supp. 3d 362, 388–89 (S.D.N.Y. 2021).

20

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

106.   This "control and discretion" requirement involves "maintain[ing] adequate documentation or adequate controls over finances to demonstrate that no funds are used for non-exempt purposes."[33]

107.   Moreover, the Sponsor should "review[] and approve[] the project as being in furtherance of it[s] own exempt purposes."[34]

108.   Simply put, Sponsors are required to maintain a high level of control and oversight over the Projects they sponsor.[35]

109.   As such, fiscal-sponsorship arrangements are typically governed by a written agreement, which usually states clearly that the Sponsor retains complete discretion and control over the use of the contributions it receives on behalf of the Project.[36]

110.   "The agreement should specify that the fiscal sponsor is responsible for all legal compliance relating to receiving, reporting, and acknowledging charitable

---

[33] *Id.* (citing I.R.S. Priv. Ltr. Rul. 201323035 (June 7, 2013)).

[34] 1966 IRB LEXIS 245, *1, Rev. Rul. 66-79, 1966-1 C.B. 48 (I.R.S. Jan. 1, 1966) ("amplifying" the ruling of 1963 IRB LEXIS 26, *7-9, Rev. Rul. 63-252, 1963-2 C.B. 101 (I.R.S. July 1, 1963)).

[35] *See* 1968 IRB LEXIS 179, *1, Rev. Rul. 68-489, 1968-2 C.B. 210 (I.R.S. July 1, 1968); *Nat'l Found. v. United States*, 13 Cl. Ct. 486, 87-2 USTC para. 9602 (1987).

[36] *Fiscal Sponsorship Additional Resources*, COUNCIL OF NONPROFITS, https://www.councilofnonprofits.org/running-nonprofit/administration-and-financial-management/fiscal-sponsorship-additional-resources#:~:text=The%20sponsor%20is%20also%20responsible,are%20all%20the%20responsibility%20of (last visited Dec. 11, 2024).

21

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

donations," and it should outline the "recordkeeping responsibilities that the sponsored organization owes the fiscal sponsor."[37]

111.  A fiscal sponsorship that operates without a written agreement creates "[a]ll sorts of room for misunderstandings, harsh feelings, and disputes."[38]

112.  This is because courts will look to the written agreement to determine the scope of the parties' fiduciary duties and fiscal and legal liabilities.[39]

113.  Indeed, while all Sponsors (1) owe a basic fiduciary duty to both themselves and their donors to ensure that the funds are used to advance the Sponsor's mission (and thereby maintain the Sponsor's tax-exempt status), and (2) can be fiscally liable for "any and all debts incurred by the project" if the Sponsor fails to uphold the "control and discretion" requirement, some Sponsors may also be legally liable for the Project's conduct.[40]

---

[37] *Fiscal Sponsorship for Nonprofits*, NAT'L COUNCIL OF NONPROFITS, https://www.councilofnonprofits.org/running-nonprofit/administration-and-financial-management/fiscal-sponsorship-nonprofits (last visited Dec. 11, 2024).

[38] *Fiscal Sponsorship: Six Ways to Do It Wrong*, NEO L. GRP. (Feb. 20, 2009), https://nonprofitlawblog.com/fiscal-sponsorship-six-ways-to-do-it-wrong.

[39] *See generally Mobilize Green, Inc. v. Cmty. Found. For Nat'l Cap. Region*, 101 F. Supp. 3d 36, 45–47 (D.D.C. 2015).

[40] *Fiscal Sponsorship: Six Ways to Do It Wrong*, NEO L. GRP. (Feb. 20, 2009), https://nonprofitlawblog.com/fiscal-sponsorship-six-ways-to-do-it-wrong.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

114.   This additional legal liability exists when the fiscal sponsorship operates under what is sometimes called the "Direct Model," whereby "[t]he fiscal sponsor directly receives donations and grants for the project."[41]

115.   Notably, under the "Direct Model," which "is the most common form of fiscal sponsorship," "the project becomes an integrated part of the fiscal sponsor, with no legal identity separate from the fiscal sponsor."[42]

116.   Essentially, the Sponsor and Project enter into an employer-employee relationship.[43]

117.   Even if the fiscal sponsorship does not operate under the "Direct Model" as specified in the written agreement, all fiscal sponsors must meet the "control and discretion" requirement to uphold their fiduciary duties.

118.   Importantly, Sponsors operating under non-Direct Models must still exercise their right to withhold funds from the Project if the funds are not being used for tax-exempt purposes.

---

[41] *Fiscal Sponsorship Basics*, JUST. & DIVERSITY CTR. OF THE BAR ASS'N OF S.F., https://www.sfbar.org/wp-content/uploads/2019/10/fiscal-sponsor-memo.pdf (last visited Dec. 11, 2024).

[42] *Id.*

[43] *Id.*

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

119.   In this sense, non-Direct Model fiscal sponsorships create an agency relationship between the parties, wherein the Sponsor directs the Project's use of its funds.[44]

120.   Defendant WESPAC Foundation ("WESPAC") is a Section 501(c)(3) non-profit organization with a principal place of business in White Plains, New York.

121.   WESPAC bills itself as a "small . . . community peace and action group."[45]

122.   That description is, at best, incomplete.

123.   While it may have been founded as a "peace and action group," today it is focused almost exclusively on supporting and platforming anti-Israel and antisemitic causes, groups, and activists.[46]

124.   For decades (and, in particular, since 2001), WESPAC has been active in organizing anti-Israel action and has explicitly endorsed the antisemitic Boycott, Divestment, and Sanctions ("BDS") movement.

---

[44] Gregory L. Colvin, *Fiscal Sponsorship: Six Ways to Do It Right—A Synopsis*, 7 EXEMPT ORG. TAX REV. 604, 608 (1993).

[45] Declaration of Robert L. Herbst, ¶ 2, Docket No. 65.

[46] Anti-Defamation League Center on Extremism, *WESPAC (Westchester People's Action Coalition) Foundation*, Anti-Defamation League (May 29, 2024), https://www.adl.org/resources/article/wespac-westchester-peoples-action-coalition-foundation

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

125.    It does so by abusing its tax-exempt status and fiscal sponsorships to provide financial and administrative support to groups and initiatives that actively denigrate, disparage, and attempt to ostracize pro-Israel and Jewish communities.

126.    WESPAC's abuse of fiscal sponsorships and its relationship with PYM are both open and notorious.

127.    Indeed, as part of an investigation into certain "illegal and antisemitic activities . . . including . . . violent demonstrations at the U.S. Capitol and Columbus Circle in Washington, D.C.," the House Committee on Oversight and Accountability and the Committee on Education requested that the U.S. Department of the Treasury produce Suspicious Activity Reports relating to WESPAC.[47]

128.    As a fiscal sponsor, WESPAC has received and administered donations on behalf of groups such as NSJP and Within Our Lifetime.

129.    Both groups openly praised the October 7, 2023, Hamas-led attack on Israel and have openly embraced antisemitic rhetoric while relying on the rhetorical fig-leaf of anti-Zionism to hide their antisemitic bias and hatred for Jews.

130.    WESPAC was also PYM's long-standing fiscal sponsor, and it remained PYM's fiscal sponsor in the days leading up to the riot.[48]

---

[47] *See* Letter from Chairman James Comer and Chairwoman Virginia Foxx to the Honorable Janet Yellen (August 21, 2024), available at https://oversight.house.gov/wp-content/uploads/2024/08/Letter-to-Treasury-re-SARS-follow-up-08-21-2024.pdf  (last accessed December 2, 2024).

[48] *Palestinian Youth Movement Profile*, NGO MONITOR (June 2, 2024),

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

131.   As PYM's fiscal sponsor in the days leading up to the riot, WESPAC's Board was required to (and, on information and belief, did in fact) make an independent determination that PYM's activities as alleged herein furthered WESPAC's mission, and approved of the same.

132.   As PYM's fiscal sponsor in the days leading up to the riot, WESPAC was required to (and, on information and belief, did in fact) retain complete control and discretion as to how PYM used funds it received from WESPAC.

133.   On information and belief, that control and discretion extended to PYM's activities as alleged herein.

134.   As PYM's fiscal sponsor in the days leading up to the riot, WESPAC was required to (and, on information and belief, did in fact) maintain complete oversight over PYM's activities, including its activities as alleged herein.

135.   On information and belief, and at all relevant times, there existed a fiscal-sponsorship agreement between PYM and WESPAC providing WESPAC with complete control, discretion, and oversight over PYM's activities, including its activities as alleged herein.

136.   On information and belief, WESPAC's fiscal-sponsorship agreement with PYM provided PYM with access to WESPAC's administrative services, staff,

_____

https://www.ngo-monitor.org/ngos/palestinian-youth-movement/#:~:text=WESPAC%20Foundation%20serves%20as%20the,amounts%20disbursed%20for%20PYM%20activities.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00001

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

and facilities, all of which were used to plan and/or carry out PYM's activities as alleged herein.

137.   On information and belief, WESPAC's fiscal-sponsorship agreement with PYM operated under the "Direct Model," whereby WESPAC directly received donations for PYM, which caused PYM to become an integrated part of WESPAC with no separate legal identity.[49]

138.   Defendant Honor the Earth ("Honor the Earth") is a Minnesota-registered Section 501(c)(3) non-profit organization that supports Hamas and opposes the state of Israel.

139.   Honor the Earth's principal place of business is in Callaway, Minnesota.

140.   Honor the Earth currently holds itself out as PYM's fiscal sponsor, and it began to hold itself out as PYM's fiscal sponsor at or around the time of the riot.[50]

141.   Honor the Earth was founded in 1993 to raise awareness and financial support for indigenous environmental justice.

142.   More recently, it has been co-opted by persons and groups with an anti-Israel and antisemitic focus, and it has turned its sights on Jewish targets in the United States.

---

[49] *See* **Exhibits 1, 2.**

[50] *See* **Exhibit 3.**

27

143. On June 7, 2024, Honor the Earth indicated on its Instagram account that Israel is an example of a "colonizer [attempting to] justify [its] presence on stolen land and erase Indigenous people and culture."[51]

144. Honor the Earth is abusing its non-profit status to collect donations on behalf of PYM, an unknown entity with no registration or tax-exempt status.

145. Since becoming the fiscal sponsor of PYM, Honor the Earth is responsible for how PYM uses its funds.

146. As PYM's fiscal sponsor at or about the time of the riot, Honor the Earth's Board was required to (and, on information and belief, did in fact) make an independent determination that PYM's activities as alleged herein furthered its own mission, and approved of the same.

147. As PYM's fiscal sponsor at or about the time of the riot, Honor the Earth was required to (and, on information and belief, did in fact) retain complete control and discretion as to how PYM used funds it received from Honor the Earth.

148. On information and belief, that control and discretion extended to PYM's activities as alleged herein.

---

[51] Honor the Earth (@honortheearth), INSTAGRAM, https://www.instagram.com/p/C77IVCwNEMm/?img_index=6&igsh=MWZoOWM0eHJ4OWR2OQ== (last visited December 19, 2024).

28

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

149.    As PYM's fiscal sponsor in the days leading up to the riot, Honor the Earth was required to (and, on information and belief, did in fact) maintain complete oversight over PYM's activities, including its activities as alleged herein.

150.    On information and belief and at all relevant times, there existed a fiscal-sponsorship agreement between PYM and Honor the Earth providing Honor the Earth with complete control, discretion, and oversight over PYM's activities, including its activities as alleged herein.

151.    On information and belief, Honor the Earth's fiscal-sponsorship agreement with PYM provided PYM with access to Honor the Earth's administrative services, staff, and facilities, all of which were used to plan and/or carry out PYM's activities as alleged herein.

152.    On information and belief, Honor the Earth's fiscal-sponsorship agreement with PYM operated under the "Direct Model," whereby Honor the Earth directly received donations for PYM, which caused PYM to become an integrated part of Honor the Earth with no separate legal identity.[52]

153.    Consequently, and to the extent that Honor the Earth became PYM's fiscal sponsor just as PYM began planning and inciting the riot, Honor the Earth is responsible for the promotion and funding that resulted in the violent riot that blocked the entrance to the Synagogue.

---

[52] *See* **Exhibit 3.**

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

154.   To date, Honor the Earth continues to support PYM by permitting PYM to evade non-profit laws and entity-registration requirements.

\*        \*        \*

155.   Does #1-100 are individuals who rioted in front of the Synagogue, thereby interfering with the ability of Plaintiff Pollak's, Proposed Class Members', and SCLJ Members' ability to exercise their First Amendment right of religious worship at the Synagogue.

156.   All Named Defendants (i.e., all Defendants except for Does #1-100) agreed with each other to take actions that were intended to deprive Plaintiff Pollak, Proposed Class Members, and SCLJ Members of their rights, privileges, and immunities, making Named Defendants co-conspirators for purposes of Section 1985 of the Ku Klux Klan Act.

157.   Collectively, Defendants used antisemitic and bigoted incitement, intimidation, and violence to physically obstruct access to and from the Synagogue, thus rendering passage to or from the Synagogue unreasonably difficult or hazardous.

## COMMON FACTUAL ALLEGATIONS

### A.    Daily Religious Activity at Adas Torah.

158.   It is impossible to appreciate the impact of the riot on Plaintiffs—and the greater Jewish community—without appropriate context and an understanding

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00001

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

of the importance of the following to Jews: gathering together; daily prayer; and

*Aliyah*, the act of returning to dwell in Israel.

159.   First, the simple act of congregating, whether at a synagogue or elsewhere (and regardless of the motivation or reason for doing so), is part and parcel of Jewish religious practice dating back to the gathering at Mount Sinai at the dawn of Jewish history.

160.   Gathering together is an important part of religious worship and practice because, among other things, it: (1) helps the Jewish community feel a sense of awe and appreciation for being part of something transcendent; (2) fosters relationships and enhances solidarity within the community; (3) provides religious strength and confidence in numbers during trying times for the faith; (4) provides the opportunity to connect with loved ones and to connect with God; and (5) allows members of the faith to be "counted" together as God's people.[53]

161.   Jewish law and custom reinforce the religious concept and importance of gathering in numerous ways.

162.   For example, certain prayers or religious rituals can only take place in the presence of a *minyan*.

163.   In the Orthodox Jewish faith, a *minyan* is a quorum of ten adult men.

---

[53] *See* Proverbs 14:28; Babylon Talmud Berachot 53a; Mishna (Rosh Hashanah 4:8); Babylon Talmud Rosh Hashanah 32b.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

164.    This quorum is so important that prayer services are referred to as a *minyan*.

165.    The importance of gathering and, in turn, the *minyan*, have a tremendous impact on another religious concept or requirement relevant here: daily prayer.

166.    The Talmud, the primary source of Jewish religious law, instructs that Jewish men and women should pray daily.

167.    In Orthodox Judaism, at least three prayer services are recited daily— Monday through Sunday, rain or shine, regardless of whether a particular day qualifies as a religious or secular holiday.

168.    The daily prayer services are the following: the morning prayer, or *shacharit*, which is recited at or about dawn; the afternoon prayer, or *mincha*, which is recited in the middle of the secular day; and the evening prayer, or *maariv*, which is generally recited at or about dusk.

169.    These daily prayer services may be supplemented by additional prayer services recited on the Jewish sabbath and on holidays.

170.    Each prayer service includes well-defined rituals and comprises specifically identified prayers, which are determined by Jewish law and custom.

171.    Certain of these rituals and prayers, however, cannot occur unless a *minyan* is present.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

172.    These rituals and prayers typically occur in synagogues like Adas Torah.

173.    These include, but are not limited to, *Kaddish*, *Barchu*, *Kedusha*, and the repetition of the *Amidah*.[54]

174.    Given the importance of daily prayer, and gathering generally, many in the Orthodox Jewish community believe that daily prayer as part of a *minyan* is not only laudable, but it also amounts to a religious commandment—known as a *mitzvah*.

175.    Because of the importance of daily prayer as part of a *minyan*, many Orthodox Jewish houses of worship—including the Synagogue—host at least three daily communal prayer meetings—*minyanim*.

176.    These daily *minyanim* may or may not be publicized on a communal calendar and occur daily regardless of whether they are advertised on a communal calendar.

177.    Nevertheless, they occur like clockwork, with worshippers regularly and reliably appearing in the morning, at or about noon, and at or about dusk, to pray together.

178.    The importance of gathering for prayer and other reasons also dovetails with the concept of *Aliyah*.

---

[54] *See*, *e.g.*, Mishna (Megillah 4:3).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

179.    *Aliyah* is a Hebrew word that, when translated directly into English, means "rise" or "ascent."

180.    Its meaning to Jews, however, extends beyond that literal translation.

181.    Instead, *Aliyah*, as a religious concept, has a far deeper meaning.

182.    It is the return to and gathering of the Jews in their ancestral homeland—Israel.

183.    The importance of *Aliyah* and its role as a predominant aspect of the Jewish faith date back millennia.

184.    The term is used in the Torah to describe the return of Jacob's bones from Egypt to the Land of Israel.[55]

185.    The Talmud explains that Judaism includes a religious commandment—a *mitzvah*—to buy land in Israel and to dwell there.[56]

186.    In fact, the Talmud makes clear that the religious commandment to make *Aliyah*, which specifically includes buying a home in Israel, "is equivalent to all of the other commandments in the Torah."[57]

---

[55] *See* Genesis 50:13.

[56] *See, e.g.*, Babylonian Talmud, Ketubot 110b; Numbers 33:53; Deuteronomy 11:31.

[57] *See, e.g.*, Babylonian Talmud Gittin 8b; Sifrei, Re'eh, 53.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

187.    Indeed, the specific commandment to buy a home in Israel and to dwell there is so special that some Jewish scholars believe it overrides other commandments.[58]

188.    The *mitzvah* of *Aliyah* is so important that it merits its own discussions in the Talmud and other rabbinic texts.[59]

189.    And( as with other *mitzvot*) the preparations to make *Aliyah*—i.e., preparing to return to and dwell in Israel—are also considered at least a partial fulfillment of the *mitzvah* of *Aliyah*.[60]

190.    In other words, simply educating oneself about the process of returning to Israel, the options for buying a house there, and other related acts fulfill a separate religious obligation.[61]

191.    While not all Jews adhere to the above concepts and beliefs, they are common and widespread, particularly among members of the Orthodox Jewish community.

---

[58] *See* Babylonian Talmud, Bava Kamma 80b.

[59] *See, e.g.*, Babylonian Talmud, Gittin 8b, Shulchan Aruch (Code of Jewish Law), Orach Chayim 306:11.

[60] *See* Peninei Halakha, Shabbat 9:12 (citing Ramban (Nachmanides) on Babylonian Talmud Shabbat 130b); Rivash §387; *see also* Artzot Ha'Chaim, p. 2 (discussing how every step on the way is a separate fulfillment of a commandment).

[61] *See id*.

35

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

192.    For Plaintiffs (as well as many other members of the Orthodox Jewish community), gathering together, daily prayer, and *Aliyah* are the outward manifestation of deeply held religious beliefs.

193.    They represent central tenets of the Jewish religion, and interference with any one of them amounts to interference with Jewish religious practice and expression.

**B.    The Synagogue and the Surrounding Pico-Robertson Neighborhood.**

194.    The Synagogue is an Orthodox Jewish house of worship located in Los Angeles's Pico-Robertson neighborhood.

195.    The Synagogue offers the Jewish community in general—and the Pico-Robertson Jewish community, in particular—with multiple daily *minyanim*, Torah and religious study sessions, and other religious events.

196.    Approximately thirty to forty people, including some Proposed Class Members and SCLJ Members, regularly attend the Synagogue's daily *mincha minyan*, which typically occurs at approximately 1:30 PM.

197.    Pico-Robertson is a major center of Jewish life in Los Angeles.

198.    It is home to a large community of Jews, many of whom are observant.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00000

199.   It features more than thirty kosher restaurants; multiple *mikvahs*;[62] several Jewish day schools; dozens of synagogues; multiple kosher butchers, grocery stores, and food shops; Judaica stores; and other resources and amenities focused on the Jewish community.

C.    **The *Aliyah* Event.**

200.   In the days before June 23, 2024, a real-estate company known as "My Home in Israel" announced it would host an *Aliyah*-focused event at two Los Angeles-area synagogues.

201.   My Home In Israel specializes in helping American Jews buy homes in Israel so they can fulfill the *mitzvah* of *Aliyah*.

202.   The first event was scheduled to occur on June 20 at Shaarey Zedek, an Orthodox synagogue in North Hollywood.

203.   The second event (the "*Aliyah* Event") was scheduled to occur at the Adas Torah Synagogue on June 23.

204.   Although some outsiders have characterized the *Aliyah* Event as a mere housing or real-estate event, it was anything but that.

205.   For many in the Orthodox Jewish community, the *Aliyah* Event (and others like it), which educate people about making *Aliyah*, represents an integral part of Jewish religious observance.

---

[62] A *mikvah* is a bath used for ritual immersion in Judaism.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

206.    Meetings like the *Aliyah* Event are often held in synagogues and include prayer or Torah study because it is generally understood by the community that these are religious events.

### D.    Defendants Organize Rioters (Including Does #1-100) To Assemble Outside the Synagogue.

207.    Upon learning of the *Aliyah* Event, the Named Defendants organized a mob (including Does #1-100) to assemble outside the Synagogue.

208.    Specifically, the Named Defendants agreed with each other and worked collectively on a plan to disrupt, impede, and prevent the religious events at the Synagogue on June 23, 2024.

209.    The plan started with a collective decision to organize rioters in front of the Synagogue.

210.    Their call to arms was fueled by the lie that the Synagogue was about to commit an international war crime by encouraging its congregants to "steal" Palestinian land.

211.    Upon information and belief, the Named Defendants' social media posts were designed to maximize public outrage.

212.    On Friday, June 21, 2024, CodePink Women for Peace's Los Angeles and Southeast Los Angeles chapters issued a collaborative post[63] on Instagram,

---

[63] A collaborative post is one that both accounts agree to have appear on their respective profiles. *See* HUBSPOT, *How to Collab Post on Instagram as a Brand or Creator [Steps + Tips]*, https://blog.hubspot.com/marketing/instagram-

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

claiming that "A MEGA ZIONIST REAL ESTATE EVENT IS IN LA THIS WEEK!"[64]

213.   The post featured multiple slides, including a slide that urged: "HELP US ADVOCATE THE STOP OF HOMES BEING SOLD ON STOLEN PALESTINIAN LAND!"[65]

214.   The posts included the dates and addresses of two events—one at Shaarey Zedek in North Hollywood on June 20 and the second at Adas Torah on June 23.[66]

215.   Both Shaarey Zedek and Adas Torah are identified by name in CodePink's posts.

216.   Both synagogues are well-known in the community as being places of religious worship.

217.   The dates and addresses were placed inside inverted red triangles.[67]

---

collab-post (last visited December 18, 2024).

[64] CODEPINK Southeast Los Angeles (@codepinksela) & CODEPINK Los Angeles (@codepinkla), INSTAGRAM, https://www.instagram.com/p/C8c6f8dyplb/?img_index=1 (last visited July 3, 2024).

[65] *Id.*

[66] *Id.*

[67] *Id.*

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

218.    Since October 7, 2023, Hamas and its supporters (particularly those on social media) have used inverted red triangles as a symbol for Hamas and to celebrate its use of violence against Jews and Israelis.

219.    In other words, the inverted red triangle acts as a target designator to identify Jews and Jewish targets for extermination.[68]

220.    Also, on June 21, 2024, PYM posted a slide on its Instagram, calling for its members to show up at "12 PM SHARP" and declaring "OUR LAND IS NOT FOR SALE."[69]

221.    The slide continues: "STAND AGAINST SETTLER EXPANSION AT SUNDAY'S REAL ESTATE EVENT SELLING HOMES TO BUILD 'ANGLO NEIGHBORHOODS' IN PALESTINE."[70]

222.    The caption beneath the slide states: "Racist settler expansionists are not welcome in Los Angeles! This blatant example of land theft is operating in our own backyard. The Nakba[[71]] is ongoing and must be confronted!"

---

[68] Anti-Defamation League, *Glossary Terms: Inverted Triangle*, ADL, https://extremismterms.adl.org/glossary/inverted-red-triangle (last visited Sept. 28, 2024).

[69] PYM LA-OC-IE (@pymlaocie) & Palestinian Youth Movement (@palestinianyouthmovement), INSTAGRAM, https://www.instagram.com/p/C8dActZyjiI/?igsh=d3o3eWw3OTZrZjhk (last visited July 3, 2024).

[70] *Id.*

[71] PYM LA-OC-IE (@pymlaocie) & Palestinian Youth Movement (@palestinianyouthmovement), INSTAGRAM,

223.   It concludes: "FROM THE BELLY OF THE BEAST[.] NO JUSTICE, NO PEACE."[72]

224.   Upon information and belief, the phrase "BELLY OF THE BEAST" refers to a synagogue, a place where Jews congregate to pray.

225.   Defendant Schirf controls PYM's social media generally, and Defendant Ibrahim controls PYM's social media for the Los Angeles local chapter.

226.   Ms. Schirf and Mr. Ibrahim promoted the attack under the name of PYM on their Instagram profiles.

**E.    Defendants' Members and Does #1-100 Riot Outside the Synagogue.**

227.   On June 23, 2024—the day of the *Aliyah* Event—the Synagogue was scheduled to host several additional religious events, including but not limited to, at least one *minchah minyan*, as well as multiple Torah study sessions.

228.   As the starting time of the *Aliyah* Event approached, more than two-hundred rioters (including Does #1-100) that had been organized and incited by the

https://www.instagram.com/p/C8dActZyjiI/?igsh=d3o3eWw3OTZrZjhk (last visited July 3, 2024). *Nakba* refers to the defeat of the Arab armies in the 1948 war for Israel's independence after the Arab armies invaded Israel. *See Nakba*, Jewish Virtual Library, https://www.jewishvirtuallibrary.org/nakba (last visited July 12, 2024).

[72] *Id.*

41

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

Named Defendants, marched into Pico-Robertson—the heart of Los Angeles's Jewish community—and physically obstructed access to the Synagogue.

229.  Chaos and violence quickly ensued.

230.  Specifically, the rioters, which included Does #1-100 and who were incited and organized by Named Defendants, donned masks and held signs, threw punches at Synagogue members and Jews who had arrived to provide support for their fellow worshippers, and engaged in other acts of violence.

231.  Many of those rioters, including Does #1-100, were armed with various weapons, including bear spray and blunt objects.

232.  One of those rioters was observed hitting a Jewish individual in the head and back with a metal water bottle.

233.  Another rioter was observed filling a sock with rocks and brandishing the rock-filled sock as a weapon.

234.  Some rioters arrived wearing ski goggles in preparation for the violence.[73]

235.  Many of the rioters arrived wearing matching keffiyehs.

236.  Upon information and belief, these keffiyehs were distributed by Named Defendants to Does #1-100 to conceal the rioters' identities.

_____

[73] Michael Starr, *Anti-Israel Protestors Beat, Bear Mace Jews, Journalists At LA Synagogue*, JERUSALEM POST (June 24, 2024, 2:13 AM), https://www.jpost.com/breaking-news/article-807411.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

237.   The rioters were also observed organizing in groupings in neighboring streets and were systematically sent to the Synagogue when reinforcement protesters were needed due to increased Jewish and police presence.

238.   This was observed by multiple people and demonstrates that the rioters were organized, coordinated, and controlled by Named Defendants.

239.   Others wore Hamas's green headbands, while chanting "Intifada!" and calling for violence against Jews.[74]

240.   While the riot was raging, worshippers (including Plaintiff Pollak, Proposed Class Members, and SCLJ Members) were attempting to enter the Synagogue to gather or attend one or several of the following: a prayer session or *minyan*; a Torah study session; and the *Aliyah* Event.

241.   The rioters (including Does #1-100) prevented individuals (including Plaintiff Pollak, Proposed Class Members, and SCLJ Members) from gathering and exercising their First Amendment right to practice their religion at the Synagogue.

242.   By stoking such unrest and perpetuating violence, Named Defendants and Does #1-100 prevented Plaintiff Pollak, Proposed Class Members, and SCLJ

---

[74] Summer Lin et al., *More Details Emerge On Protest Outside L.A. Synagogue*, YAHOO! NEWS (June 27, 2024, 6:00 AM), https://au.news.yahoo.com/very-traumatic-medic-describes-things-100038626.html.

43

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

Members from practicing their religion free from persecution, intimidation, and violence.

243.   Footage of the violence quickly spread throughout social media.[75]

244.   Scenes of blood on the streets, use of bear spray, and the brandishing of blunt-force weapons (including, among other things, a skateboard), permeated cyberspace and were reported by dozens of news outlets.

245.   About sixty police officers were called to the scene to stop the violent rioters, while many people were treated for their injuries.

246.   Police arrested Doe #1, who was carrying a spiked post, for possessing a prohibited item.[76]

247.   Pico-Robertson resident Talia Regev tried to enter the Synagogue, but she was bear sprayed.[77]

---

[75] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/reel/C8khglxyMw4/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

[76] *See Person with spiked post arrested in clash outside Los Angeles synagogue,* NBC LOS ANGELES, (June 24, 2024), https://www.nbclosangeles.com/news/local/arrest-la-synagogue-protest-israelpalestine/3443019/.

[77] *See L.A.'s Adas Torah Violently Attacked by Pro-Palestinian Protestors at Real Estate Event,* THE JEWISH LINK (June 27, 2024), jewishlink.news/l-a-s-adas-torah-violently-attacked-by-pro-palestinianprotestors-at-real-estate-event/.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

248.   Naftoli Sherman, suffered a broken nose and a black eye after being attacked by rioters.[78]

**F.    Ronen Helmann's Experiences on the Day of the Riot.**

249.   On the day of the riot, Ronen Helmann was walking in the Pico-Robertson neighborhood where he resides.

250.   Helmann frequently congregates and prays at the Synagogue.

251.   Helmann noticed Jane Does 1-3—women who were wearing headscarves and masks covering their faces—walking from house to house.

252.   Helmann saw that Jane Does 1-3 were checking the doors of the houses for *mezuzot*.[79]

253.   Jane Does 1-3 appeared to be taking pictures of homes with *mezuzot*.

254.   Helmann also noticed that Jane Does 1-3 were marking the cars that they suspected were associated with houses with *mezuzot*.

255.   Jane Does 1-3 were communicating on cell phones.

256.   Helmann became frightened, so he began walking toward the Synagogue to congregate with other community members and pray for the safety of the Synagogue.

---

[78] *Id.*

[79] A *mezuzah* is a prayer scroll affixed by Jews to the doorposts of their homes.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.0000

257.   As he got closer to the Synagogue, Helmann saw a mob of anti-Israel protesters (John Does 2-11) standing in the way of the entrance to the Synagogue.

258.   Helmann saw that John Does 2-11 had masks, backpacks, and bear spray.

259.   He feared that they had other weapons.

260.   As Helmann walked toward the Synagogue, John Does 2-11 approached him with cameras, came right up to his face, and took pictures of him.

261.   John Does 2-10 then started yelling at him.

262.   John Doe 2 yelled at Helmann, calling him a "nazi."

263.   John Doe 3 yelled: "Hitler didn't finish the job!"

264.   John Doe 4 yelled: "Baby murderer!"

265.   John Doe 5 yelled: "Colonizers!"

266.   John Doe 6 asked: "To which God are you praying?"

267.   John Doe 7 yelled: "Leave the neighborhood, we are coming!"

268.   John Doe 8 yelled: "Itbach el yehud!" ("slaughter the Jews" in Arabic).

269.   John Does 9-11 yelled other racial and ethnic slurs about Jews.

270.   Because of the intimidating and threating presence and conduct of the mob thus rendering passage to and from the Synagogue unreasonably difficult or hazardous, Helmann decided it was not safe to enter the Synagogue to pray, so he instead returned home.

### G.    SCLJ Members Experiences on the Day of the Riot.

46

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

271.    SCLJ Member #1 was one of the worshippers who was prevented by the mob from exercising his constitutionally and statutorily protected free-exercise rights to attend the *Aliyah* Event.

272.    SCLJ Member #1 had preregistered to attend the *Aliyah* Event.

273.    SCLJ Member #1 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted him into the building.

274.    SCLJ Member #1 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

275.    SCLJ Member #2 was one of the worshippers who was initially prevented by the mob from exercising her constitutionally and statutorily protected free-exercise rights to attend both the *Aliyah* Event and an afternoon prayer service.

276.    SCLJ Member #2 had preregistered to attend the *Aliyah* Event.

277.    SCLJ Member #2 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted her into the building.

278.    SCLJ Member #2 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

279.    SCLJ Member #2 did not find an available prayer service to join.

280.    On information and belief, the reason why SCLJ Member #2 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

281.   SCLJ Member #3 was one of the worshippers who was initially prevented by the mob from exercising her constitutionally and statutorily protected free-exercise rights to attend both the *Aliyah* Event and an afternoon prayer service.

282.   SCLJ Member #3 had intended to attend the *Aliyah* Event with her mother.

283.   SCLJ Member #3 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted her into the building.

284.   SCLJ Member #3 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

285.   SCLJ Member #3 did not find an available prayer service to join.

286.   On information and belief, the reason why SCLJ Member #3 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

287.   SCLJ Member #4 was one of the worshippers who was initially prevented by the mob from exercising his constitutionally and statutorily protected free-exercise rights to attend the *Aliyah* Event and to participate in an afternoon prayer service.

288.   SCLJ Member #4 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted him into the building.

289.   SCLJ Member #4 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

48

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

290.   SCLJ Member #4 did not find an available prayer service to join.

291.   On information and belief, the reason why SCLJ Member #4 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

292.   SCLJ Member #5 was one of the worshippers who initially was prevented by the mob from exercising his constitutionally and statutorily protected free-exercise rights to attend the *Aliyah* Event and to participate in an afternoon prayer service.

293.   SCLJ Member #5 had preregistered to attend the *Aliyah* Event.

294.   SCLJ Member #5 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted him into the building.

295.   SCLJ Member #5 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

296.   SCLJ Member #5 did not find an available prayer service to join.

297.   On information and belief, the reason why SCLJ Member #5 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

298.   SCLJ Member #6 had attended morning prayer services at the Synagogue and remained inside the building when the riot commenced.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

299.   When the riot began, SCLJ Member #6 was attempting to study Torah, but he had trouble doing so because of the violent commotion outside the building, as rioters blocked access to and from the Synagogue and the adjacent sidewalks.

300.   SCLJ Member #7 was one of the worshippers who was prevented entirely by the mob from exercising his constitutionally and statutorily protected free-exercise rights to participate in an afternoon prayer service, which he regularly attends at the Synagogue.

301.   SCLJ Member #7 was not a member of the aforementioned WhatsApp96-154 group containing some of the Synagogue's congregants, so he was unaware of the alternate entrance.

302.   Therefore, SCLJ Member #7 was barred entirely from entering the Synagogue.

303.   Though all three events continued at the Synagogue on June 23, 2024, upon information and belief, many regular members who either attend *minyan* or study Torah at the Synagogue in the afternoon were entirely unable to do so, much like SCLJ Member #7.

304.   Similarly, upon information and belief, many individuals who would have otherwise attended the *Aliyah* Event were prevented or dissuaded from doing so because of the mob.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

305.   Of those Proposed Class Members and SCLJ Members who eventually were able to attend events at the Synagogue, their initial attempts to attend the events were obstructed by rioters.

306.   Moreover, those Proposed Class Members and SCLJ Members had to expose themselves to physical danger to enter the Synagogue.

307.   On information and belief, the reason why the members who were able to enter the Synagogue were nonetheless unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

**H.    Plaintiff Pollak's Experiences on the Day of the Riot.**

308.   On the day of the riot, Plaintiff Pollak came to the Synagogue with his children to gather with other members of his faith and to learn more about how he could purchase real estate in Israel, which he believed would fulfill important religious requirements.

309.   When Plaintiff Pollak arrived on Pico Boulevard—a major four-lane road—he noticed the street had been shut down by the police and an LAPD helicopter circled noisily overhead.

310.   Dozens of police officers stood tightly together in riot gear directly in front of the Synagogue

311.   They had their nightsticks drawn.

312.    As Plaintiff Pollak inched closer, he noticed the rioters behind the phalanx of LAPD officers, on the sidewalk in front of the Synagogue.

51

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

313.   When Plaintiff Pollak approached the police with his children and asked if he could enter the Synagogue, the law-enforcement officials told him not to come any closer and instructed him to leave.

314.   Plaintiff Pollak calmly asked the officers: "Shouldn't you be making sure this place stays open?"

315.   Their reply was: "You should leave."

316.   Due to the rioters' slurs, as well as their aggressive and violent behavior, Plaintiff Pollak quickly moved himself and his kids to safety and eventually entered the Synagogue through an unmarked side entrance.

317.   While he eventually entered the Synagogue, his passage to and from it was rendered unreasonably difficult and hazardous due to the violent and hate-fueled actions of the rioters.

318.   Plaintiff Pollak's wife also encountered the police and rioter blockade in front of the Synagogue

319.   She, too, was unable to enter the Synagogue through the front.

320.   Plaintiff Pollak guided her through the violence to the same side entrance he previously used.

321.   Again, while Plaintiff Pollak's wife eventually entered the Synagogue, her passage to and from it was rendered unreasonably difficult and hazardous due to the violent and hate-fueled actions of the rioters.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.0000

## I. CodePink Acknowledges Its Participation in and Organization of the Riot and Tries To Spin a False Narrative.

322.   The violence—and Named Defendants' and Does #1-100's interference with Plaintiffs' attempts to exercise their First Amendment rights at the Synagogue—were reported in real time.

323.   *The Wall Street Journal* published an article titled: "Pro-Palestinian Protesters Block Access to Los Angeles Synagogue in Violent Clash."[80]

324.   KTLA 5 news station also reported that, "[a]ccording to video posted to the Citizen app, pro-Palestinian protesters blocked the entrance to a synagogue."[81]

325.   The next day, *The Jerusalem Post* published an article titled: "Anti-Israel protesters beat, bear mace Jews, journalists at LA synagogue."[82]

326.   On the day of the riot, CodePink's Southeast Los Angeles chapter posted on its Instagram account a video from the riot, confirming its presence outside the Synagogue.[83]

_____

[80] Alyssa Lukpat, *Pro-Palestinian Protesters Block Access to Los Angeles Synagogue in Violent Clash*, WALL ST. J. (June 24, 2024, 5:48 PM), https://www.wsj.com/us-news/pro-palestinian-protesters-block-access-to-los-angeles-synagogue-in-violent-clash-7d48098f.

[81] Austin Turner & Josh DuBose, *Pro-Palestinian And Pro-Israeli Demonstrators Clash Outside Synagogue In Los Angeles*, KTLA 5, (June 23, 2024, 2:34 PM), https://ktla.com/news/local-news/protesters-allegedly-block-entrance-to-synagogue-in-los-angeles/.

[82] Michael Starr & Jerusalem Post Staff, *Anti-Israel protesters beat, bear mace Jews, journalists at LA synagogue*, JERUSALEM POST (June 24, 2024).

[83] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM,

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

327.   The same day, the Southeast Los Angeles chapter, in collaboration with the CodePink's Los Angeles chapter and CodePink's national organization, posted more footage from the riot, including another slide featuring a giant inverted red triangle with the address of the Synagogue inside it.[84]

328.   The photograph was captioned, in part: "Our comrades witnessed nothing out of the ordinary: madness, chaos, agitation, provoking and the use of physical force by the zi0nist [*sic*] community and LAPD."[85]

329.   In a public statement issued on June 24, 2024, CodePink acknowledged that its organizers and members attended the riot that blocked the entrance to the Synagogue: "While our comrades were physically assaulted, pepper/bear sprayed, and attacked as they walked back to their cars, LAPD did nothing to keep us safe but rather pushed and used their combat toys to add to injury."[86]

https://www.instagram.com/reel/C8khglxyMw4/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

[84] CODEPINK Southeast Los Angeles Chapter (@codepinksela) & CODEPINK Alert (@codepinkalert), INSTAGRAM, https://www.instagram.com/p/C8lLvLIJu9h/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA%3D%3D&img_index=2 (last visited July 3, 2024).

[85] *Id.*

[86] CODEPINK Los Angeles Chapter (@codepinkla) & CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/p/C8nHwetSMQR/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA%3D%3D&img_index=1 (last visited July 3, 2024).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

330.   The statement continued: "[S]hame on LA for allowing the hosting of these types of events that promote illegal sales of Palestinian territory and homes!"[87]

331.   Indeed, CodePink's website states: "CODEPINK recognizes Palestinians as the rightful owners and caretakers of Palestine, their indigenous homeland," and "[w]e support Palestinians' right to resist the violent Israeli occupation of Palestine."[88]

332.   CodePink's website further emphasizes that "[w]e must express our outrage."[89]

333.   On June 24, 2024, CodePink's national organization, in collaboration with its own Southeast Los Angeles chapter, posted on its Instagram a slide stating that "there was a peaceful protest against the illegal sale of stolen land in Palestine in a synagogue. Zionists attacked peaceful protesters, stole their phones, and LAPD watched on and helped."[90]

---

[87] *Id.*

[88] CODEPINK- JUSTICE FOR PALESTINE, https://www.codepink.org/palestine (last visited July 3, 2024).

[89] *Id.*

[90] CODEPINK Alert (@codepinkalert) & CODEPINK Southeast Los Angeles Chapter  (@codepinksela), INSTAGRAM, https://www.instagram.com/p/C8nDkh3y06J/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

334.    Beneath the slide was a longer caption stating that "[n]o religious services were scheduled at the time of the real estate sale . . . . Contrary to what the media is falsely reporting, the entrance was never blocked by anyone."[91]

335.    Both statements by CodePink are false: there were religious services scheduled at the Synagogue during the riot, the *Aliyah* Event itself was religious in nature, and the rioters (including Does #1-100) did in fact block the entrance to the Synagogue.

336.    Despite their demonstrable falsity, similar statements were posted on the Instagram accounts of CodePink's Los Angeles and Southeast Los Angeles chapters.[92]

337.    On Tuesday, June 25, 2024, the Southeast Los Angeles chapter posted a video of a press conference with multiple speakers.

338.    The first speaker—whose name is not provided—stated that the Synagogue "is complicit in war crimes through its hosting of this event."[93]

---

[91] *Id.*

[92] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/p/C8nHwetSMQR/?igsh=OWRmNXN3NW80Yzli, (last visited July 5, 2024).

[93] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/reel/C8p9LjVSX72/?igsh=ZjRlZHhmY2N2eTI4 (last visited July 5, 2024).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

339. She added: "The attendees of this illegal sale event and the LAPD unleashed violence on protesters for daring to challenge the illegal sale of Palestinian land."[94]

340. She finished by assuring that "[w]e will continue to challenge the sale of stolen Palestinian land in North American cities, no matter where these events take place."[95]

341. The next day, CodePink's Southeast Los Angeles chapter posted a single slide stating: "FUCK ISRAEL."[96]

## J.  Named Defendants' and Does #1-100's Riot Is Universally Condemned.

342. The riot outside of the Synagogue was roundly condemned across the political spectrum.

343. Los Angeles Mayor Karen Bass released a statement on the day of the riot: "Today's violence in the Pico-Robertson neighborhood was abhorrent, and blocking access to a place of worship is unacceptable . . . . I want to be clear that Los

---

[94] *Id.*

[95] *Id.*

[96] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/p/C8sWnHZy_R9/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

Angeles will not be a harbor for antisemitism and violence. Those responsible for either will be found and held accountable."[97]

344.   Similarly, President Joe Biden denounced the violent rioters the day-of: "I'm appalled by the scenes outside of Adas Torah synagogue in Los Angeles. Intimidating Jewish congregants is dangerous, unconscionable, antisemitic, and un-American. Americans have a right to peaceful protest. But blocking access to a house of worship—and engaging in violence—is never acceptable."[98]

345.   And California Governor Gavin Newsom stated that "[t]he violent clashes outside Adas Torah in Los Angeles are appalling. There is no excuse for targeting a house of worship. Such antisemitic hatred has no place in California."[99]

## CLASS ACTION ALLEGATIONS

346.   Plaintiff Pollak brings this lawsuit as a class action under Federal Rules of Civil Procedure 23(a); (b)(1)–(b)(3); and/or (c)(4), on behalf of himself and all others similarly situated as members of the following Proposed Class.

347.   This action concerns the Named Defendants' and Does #1-100's actions both prior to and on June 23, 2024, and in relation to the riot at the Synagogue.

---

[97] @MayorOfLA, X (June 24, 2024, 1:27 AM), https://x.com/MayorOfLA/status/1805110392806642141.

[98] @POTUS, X (June 24, 2024, 10:56 AM), https://x.com/POTUS/status/1805253626551497103?ref_src=twsrc%5Etfw.

[99] @CAgovernor, X (June 24, 2024, 1:16 AM), https://x.com/CAgovernor/status/1805107636368810029.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

348.   The Proposed Class is defined as:

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00001

**The Synagogue Class**

> All persons who intended to, planned to, attempted to, or did in fact enter the Adas Torah Synagogue in Los Angeles, California, on June 23, 2024, to exercise their First Amendment right of religious freedom, but who had their First Amendment right of religious freedom interfered with by the conspiracy and consequent actions of Named Defendants and Does #1-100.

349.    Excluded from the Class are: (A) Named Defendants and Does #1-100, including any entity or division in which Defendants and Does #1-100 have a controlling interest; (B) Named Defendants' and Does #1-100's agents, representatives, officers, directors, employees, trustees, members, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Named Defendants or Does #1-100; (C) other organizations, entities, members, officers, and persons affiliated with Named Defendants and Does #1-100; (D) the Judges to whom this case is assigned, their staff, and their immediate families; and (E) governmental entities.

350.    Plaintiff Pollak reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

351.    Certification of Plaintiff Pollak's claims for class-wide treatment is appropriate because Plaintiff Pollak can prove the elements of his claims on a class-wide basis using the same evidence that would be used in individual actions alleging the same claims.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00001

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

352.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Rule 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

## Numerosity and Ascertainability

353.    Although the exact number of Class Members is uncertain, the number is large enough to demonstrate that joinder is impracticable.

354.    Over one-hundred people were planning to attend and/or attempted to attend religious events at the Synagogue on June 23, 2024, and thus satisfy the proposed class definition.

355.    The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

356.    Class Members are readily ascertainable from Synagogue membership and attendance rolls, as well as through the list of registrants for the *Aliyah* Event.

357.    Additionally, Class Members can be ascertained and identified through eyewitness accounts, video footage, and the many news and police reports surrounding the riot.

## Predominance of Common Questions

358.    There are numerous questions of law and fact common to the Class Members that predominate over any individual questions.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

359.    The answers to these common questions will aid the resolution of the Class Members' common claims.

360.    These common legal and factual questions that predominate include, but are not limited to, the following:

- Whether the Named Defendants incited the riot outside the Synagogue;

- Whether the Named Defendants conspired with each other to incite the riot outside the Synagogue;

- Whether the conspiracy among the Named Defendants was intended to deprive Class Members of their rights, privileges, and immunities for purposes of Section 1985 of the Ku Klux Klan Act;

- Whether the rioters (including Does #1-100) interfered with the Class Members' entrance into the Synagogue;

- Whether the rioters (including Does #1-100) attempted to interfere with the Class Members' entrance into the Synagogue;

- Whether the rioters (including Does #1-100) physically obstructed individuals' ability to enter and exit the Synagogue by either rendering ingress and egress impassable or rendering such passage in and out of the Synagogue unreasonably difficult or hazardous;

- Whether the Named Defendants' collective act of incitement violated the FACE Act;

- Whether the rioters (including Does #1-100) violated the FACE Act.

361.    In short, Class Members' claims "depend upon . . . common contention[s]": (1) that the Defendants transgressed each of the Class Members' rights under the FACE Act, and (2) that the Named Defendants violated Section 1985

62

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

of the Ku Klux Klan Act. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

362.   Those "common contention[s]," moreover, are "of such a nature that" they are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve . . . issue[s] that [are] central to the validity of each one of the claims in one stroke." *Id.*

363.   Named Defendants' and Does #1-100's common actions—incitement and mob violence—caused an identical injury to each of the Class Members (FACE Act and Section 1985).

364.   Named Defendants' Section 1985 conspiracy also caused an identical injury to each of the Class Members.

365.   Class Members will continue to suffer emotional harm and monetary damage because of Defendants' and Does #1-100's unlawful and wrongful conduct, which was directed toward Class Members as a whole, rather than specifically or uniquely against any individual Class Member.

366.   Named Defendants conspired with each other to act in a concerted manner with respect to Class Members.

367.   Named Defendants acted in a concerted manner with respect to Class Members when they incited a mob to block access to the Synagogue.

368.   Does #1-100 acted in a concerted manner with respect to Class Members by forming a mob that blocked access to the Synagogue on June 23, 2024.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00000

369.   Without a class action, Class Members would likely find the cost of litigating their claims prohibitively expensive and would thus have no effective remedy at law.

370.   Class Members would then be left to incur damages and harms at the expense of Named Defendants and Does #1-100, which would effectively immunize the behavior of Named Defendants and Does #1-100.

**Typicality**

371.   The claims of Plaintiff Pollak are typical of the claims of the Class in that Plaintiff Pollak, like all Class Members, tried to enter the Synagogue on June 23, 2024, but had his attempt interfered with by the riot perpetuated by Does #1-100 and incited by the Named Defendants.

372.   Plaintiff Pollak has suffered harm identical to those of the rest of the Class (i.e., a FACE Act and a Section 1985 violation), which was caused by Defendants' collective conduct and Named Defendants' conspiracy.

373.   Moreover, the factual bases of Named Defendants' and Does #1-100's misconduct are common to all Class Members, including Plaintiff Pollak, and represent a common thread of misconduct resulting in injury identical to all Class Members—namely, a violation of the FACE Act, as well as Section 1985 of the Ku Klux Klan Act.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00000

## Adequate Representation

374.   Plaintiff Pollak is a resident of Los Angeles, California, and he will fairly and adequately represent and protect the interests of the Class.

375.   Plaintiff Pollak has retained counsel with substantial experience in complex litigation, including class actions, as well as actions involving combating antisemitism across the Country.

376.   Plaintiff Pollak and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

377.   Neither Plaintiff Pollak nor his counsel have interests adverse to those of the Class.

## Rule 23(b) Requirements

378.   As noted above, "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

379.   A class action suit will conserve the Court's resources and the resources of the litigating parties.

380.   A class action will also promote consistency and efficiency of adjudication by providing common answers to the common questions of conduct and damages that predominate in this action.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00001

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

381.   Class treatment is also manageable.

382.   Plaintiff Pollak is aware of no management difficulties that would preclude class certification in this case.

383.   Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Named Defendants and Does #1-100 have acted on grounds that apply generally to the Class.

384.   Further, inconsistent adjudications with respect to Named Defendants' and Does #1-100's liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests.

385.   Class-wide relief and Court supervision under Rule 23 assure fair, consistent, and equitable treatment and protection of all Class Members and uniformity and consistency in Named Defendants' and Does #1-100's future conduct.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

## FIRST CAUSE OF ACTION
**Threatening and Intimidating Persons in Violation of 18 U.S.C. § 248(a)(2)
(Plaintiff Pollak, Class Members, and SCLJ Members v.
Named Defendants and Does #1-100)**

386.   Plaintiff Pollak, Class Members, and SCLJ Members repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1 through 385 of this Complaint.

387.   Plaintiff Pollak brings this Count on behalf of himself and the Class against Named Defendants and Does #1-100.

388.   Plaintiff SCLJ brings this Count on behalf of its members against Named Defendants and Does #1-100.

389.   The FACE Act imposes civil and criminal penalties on any person who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with . . . any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

390.   The FACE Act also imposes civil and criminal penalties on any person who "by force or threat of force or by physical obstruction . . . *attempts* to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." *Id.* (emphasis added).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00001

391.   The FACE Act permits an action to be brought "by [any] person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship or by the entity that owns or operates such place of religious worship." *Id.* § 248(c)(1)(A).

392.   The Synagogue is a place of religious worship for purposes of the FACE Act. *Id.* § 248(a)(2).

393.   All the events taking place at the Synagogue on June 23, 2024, involved the "exercise [of] the First Amendment right of religious freedom at a place of religious worship." *Id.*

394.   On June 23, 2024, Plaintiff Pollak, Class Members, and SCLJ Members were "seeking to exercise the First Amendment right of religious freedom at a place of religious worship," namely the Synagogue, but members of Named Defendants and Does #1-100 either forcefully prevented them from doing so or attempted to forcefully prevent them from doing so. *See id.*

395.   Named Defendants and Does #1-100 by force, threat of force, or physical obstruction intentionally injured, intimidated, interfered with, and attempted to injure, intimidate, and interfere with the worship services being held at the Synagogue on June 23, 2024.

396.   Named Defendants and Does #1-100 helped to plan, organize, advertise, and (on information and belief) fund the violent mob that threatened and

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

intimidated the individuals lawfully exercising or seeking to exercise their First Amendment right of religious freedom at the Synagogue.

397. The mob organized by Named Defendants and participated in by Does #1-100 also employed tactics to prevent Plaintiff Pollak, Class Members, and SCLJ Members from exercising their First Amendment right of religious freedom at the Synagogue.

398. Members of Named Defendants and Does #1-100 participated in the violence that prevented Plaintiff Pollak, Class Members, and SCLJ Members from accessing the Synagogue.

399. Other rioters were encouraged by Named Defendants and Does #1-100 to take part in the violence that prevented Plaintiff Pollak, Class Members, and SCLJ Members from accessing the Synagogue.

400. Media reports and footage detailed the scenes of blood on the streets, the use of bear spray, and the brandishing of other weapons, including a spiked post.[100]

---

[100] Summer Lin et al., *More Details Emerge On Protest Outside L.A. Synagogue*, Yahoo! News (June 27, 2024, 6:00 AM), https://au.news.yahoo.com/very-traumatic-medic-describes-things-100038626.html; CODEPINK Southeast Los Angeles Chapter (@codepinksela), Instagram, https://www.instagram.com/reel/C8khglxyMw4/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024); Person with spiked post arrested in clash outside Los Angeles synagogue." NBC Los Angeles, 24 June 2024, https://www.nbclosangeles.com/news/local/arrest-la-synagogue-protest-

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

401.   Named Defendants' and Does #1-100's actions violated the FACE Act.

402.   Named Defendants' and Does #1-100's actions harmed Plaintiff Pollak, Class Members, and SCLJ Members.

403.   The actions undertaken by Named Defendants and Does #1-100 were so reprehensible that they justify imposition of punitive damages.

404.   On behalf of himself and the Class, Plaintiff Pollak seeks compensatory damages, statutory damages, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, punitive damages, and the costs of this suit and reasonable fees for attorneys and expert witnesses.

405.   On behalf of its members, SCLJ seeks compensatory damages, statutory damages, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, punitive damages, and the costs of this suit and reasonable fees for attorneys and expert witnesses.

israelpalestine/3443019/ (last accessed July 7, 2024).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

## SECOND CAUSE OF ACTION
### Conspiracy To Deprive Plaintiffs of Equal Protection of the Laws and Equal Privileges and Immunities Under the Law in Violation of 42 U.S.C. § 1985(3)
### (Plaintiff Pollak, Class Members, and SCLJ Members v. Named Defendants)

406.   Plaintiff Pollak, Class Members, and SCLJ Members repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1 through 385 of this Complaint.

407.   Plaintiff Pollak brings this Count on behalf of himself and the Class against Named Defendants.

408.   Plaintiff SCLJ brings this Count on behalf of its members against Named Defendants.

409.   Under 42 U.S.C. § 1985, "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," and "if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

410.   The Synagogue is a place of religious worship where congregants exercise their First and Fourteenth Amendment rights to practice their religion.

411.   Plaintiff Pollak, Class Members, and SCLJ Members attempted to exercise their right to religious freedom at a place of religious worship (the Synagogue) on June 23, 2024, to gather as a people and serve as a strength to one another.

412.   On June 23, 2024, at the time of the riot, the Synagogue was hosting its afternoon *minyan*, daily Torah Study Sessions, and the *Aliyah* Event.

413.   In the days leading up to June 23, 2024, the Named Defendants agreed among themselves to organize the riot outside the Synagogue.

414.   In the days leading up to June 23, 2024, the Named Defendants acted in furtherance of their agreement by in fact organizing and inciting the riot outside the Synagogue.

415.   By agreeing to work together to organize and incite the riot outside the Synagogue, Named Defendants conspired to deprive Plaintiff Pollak, Class Members, and SCLJ Members of their rights, privileges, and immunities under the law.

416.   Specifically, Named Defendants conspired to violate Plaintiff Pollak's, Class Members', and SCLJ Members' rights under the First and Fourteenth Amendments, as well as the FACE Act.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

417. The conspiracy was motivated by invidiously discriminatory animus for the Jewish faith of Plaintiff Pollak, Class Members, and SCLJ Members.

418. Named Defendants and Does #1-100 acted with intent to harm Plaintiff Pollak, Class Members, and SCLJ Members based on their membership in this protected class and with the specific intent to deprive Plaintiff Pollak, Class Members, and SCLJ Members of their ability to gather together and freely attend, exercise, and take part in the afternoon *minyan*, daily Torah Study Sessions, and the *Aliyah* Event at the Synagogue on June 23, 2024.

419. In furtherance of this conspiracy, Named Defendants helped plan, organize, advertise, and (on information and belief) fund the violence that occurred outside of the Synagogue, calling to "STAND AGAINST SETTLER EXPANSION" and saying, "Racist settler expansionists are not welcome in Los Angeles!"

420. Anti-Zionism (opposition to the State of Israel's existence) has been equated with antisemitism (invidious discrimination against Jews) by Congress,[101] the White House,[102] and judges in this district.[103] *See also* The Working Definition

---

[101] *See* Strongly Condemning and Denouncing the Drastic Rise of Antisemitism in the United States and Around the World, H. Res. 894, 118th Cong. (2024) (the House of Representatives "clearly and firmly states that anti-Zionism is antisemitism").

[102] *See* Exec. Order No. 13,899, 84 Fed. Reg. 68,779 (Dec.11, 2019) (stating "all executive departments and agencies" shall consider the "working definition of anti Semitism adopted . . . by the International Holocaust Remembrance Alliance" which counts as antisemitism the "targeting the State of Israel").

[103] *Frankel v. Regents of the Univ. of Cal.*, No. 2:24-cv-04702-MCS-PD,

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

of Antisemitism, Int'l Holocaust Remembrance All., https://bit.ly/3rxsuV2 (last visited Dec. 18, 2024).

421.   Members of Named Defendants and Does #1-100, upon receiving encouragement from the Named Defendants, participated in the violence that prevented Plaintiff Pollak, Class Members, and SCLJ Members from accessing the Synagogue.

422.   Media reports and footage detailed the scenes of blood on the streets, the use of bear spray, and the brandishing of makeshift weapons, including a spiked post.[104]

423.   Named Defendants and Does #1-100's conduct prevented or interfered with Plaintiff Pollak, Class Members, and SCLJ Members ability to attend the afternoon *minyan*, the daily Torah Study Sessions, or the *Aliyah* Event at the

_____

2024 U.S. Dist. LEXIS 146433, at *22 (C.D. Cal. Aug. 13, 2024) (finding that supporting the State of Israel can be part of Jewish students core religious beliefs).

[104] Summer Lin et al., *More Details Emerge On Protest Outside L.A. Synagogue*, Yahoo! News (June 27, 2024, 6:00 AM), https://au.news.yahoo.com/very-traumatic-medic-describes-things-100038626.html; CODEPINK Southeast Los Angeles Chapter (@codepinksela), Instagram, https://www.instagram.com/reel/C8khglxyMw4/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024); Person with spiked post arrested in clash outside Los Angeles synagogue." NBC Los Angeles, 24 June 2024, https://www.nbclosangeles.com/news/local/arrest-la-synagogue-protest-israelpalestine/3443019/ (last accessed July 7, 2024).

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

Synagogue, thus depriving Plaintiff Pollak, Class Members, and SCLJ Members of their rights, privileges, and immunities under law.

424.   Each Named Defendant entered into an agreement to deprive (both directly and indirectly) Plaintiff Pollak, Class Members, and SCLJ Members of their rights, privileges, and immunities under law.

425.   Each Named Defendant acted in furtherance of that agreement.

426.   As a result, Plaintiff Pollak, Class Members, and SCLJ Members were deprived of their rights, privileges, and immunities.

427.   Defendants' and Does #1-100's actions were motivated by "racial . . . class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)

428.   Named Defendants' and Does #1-100's actions violated 42 U.S.C. § 1985.

429.   Named Defendants' actions harmed Plaintiff Pollak, Class Members, and SCLJ Members.

430.   The actions undertaken by Named Defendants were so reprehensible that they justify imposition of punitive damages.

431.   On behalf of himself and the Class, Plaintiff Pollak seeks compensatory damages, permanent injunctive relief, punitive damages, and the costs of this suit and reasonable fees for attorneys and expert witnesses.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

432.    On behalf of its members, SCLJ seeks compensatory damages, statutory damages, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, punitive damages, and the costs of this suit and reasonable fees for attorneys and expert witnesses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pollak, on behalf of the Class Members, and SCLJ, on behalf of its members, respectfully request that this Court enter judgment in their favor and against Defendants and Does #1-100, as follows:

1.    Enter judgment against Named Defendants and Does #1-100, jointly and severally, for compensatory damages or statutory damages, under the FACE Act (Count I);

2.    Enter judgment against Named Defendants, jointly and severally, for compensatory damages or statutory damages, under 42 U.S.C. § 1985 (Count II);

3.    Enter judgment against Named Defendants and Does #1-100, jointly and severally, for punitive damages, under the FACE Act (Count I);

4.    Enter judgment against Named Defendants, jointly and severally, for punitive damages, under 42 U.S.C. § 1985 (Count II);

5.    Award Plaintiff Pollak, Class Members, and SCLJ their reasonable costs and expenses, including attorney fees, incurred in this action as authorized by 18 U.S.C. § 248(c)(1)(B) (Count I);

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00000

6.    Award Plaintiff Pollak, Class Members, and SCLJ their reasonable costs and expenses, including attorney fees, incurred in this action, as authorized by 42 U.S.C. § 1988 (Count II);

7.    Enjoin Named Defendants, Named Defendants' members, and Does #1-100 from going within three-hundred feet of Adas Torah, under the FACE Act (Count I);

8.    Enjoin Named Defendants and Named Defendants' members from going within three-hundred feet of Adas Torah, under 42 U.S.C. § 1985 (Count II); and

9.    Award such other relief as the Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Pollak, Class Members, and SCLJ respectfully demand a trial by jury of all issues triable by jury.

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

1    Respectfully submitted this 19th day of December 2024.

2                                          GIPSON HOFFMAN PANCIONE

3                                          A Professional Corporation

4

5                                          /s/ Daniel R. Paluch

6                                          DANIEL R. PALUCH
                                           Attorneys for Plaintiffs and Class
7                                          Members

8
     Mark Goldfeder*                       Jason B. Torchinsky*
9    mark@jewishadvocacycenter.org         jtorchinsky@holtzmanvogel.com
     Ben Schlager*                         Edward M. Wenger*
10   ben@jewishadvocacycenter.org          emwenger@holtzmanvogel.com
     NATIONAL JEWISH ADVOCACY              Erielle Davidson*
11   CENTER, INC.                          edavidson@holtzmanvogel.com
     INTERNATIONAL LEGAL FORUM             HOLTZMAN VOGEL BARAN
12   1718 General George Patton Drive      TORCHINSKY & JOSEFIAK, PLLC
     Brentwood, TN 37027                   2300 N Street NW
13   (800) 269-9895 (telephone)            Suite 643
     (800) 758-5232 (facsimile)            Washington, DC 20037
14                                         (202) 737-8808 (telephone)
                                           (540) 341-8809 (facsimile)
15

16
     John Cycon*
17   jcycon@holtzmanvogel.com              Attorneys for Plaintiffs and Class Members
     HOLTZMAN VOGEL BARAN                  *Pro Hac Vice
18   TORCHINSKY & JOSEFIAK, PLLC
     15405 John Marshall Highway
19   Haymarket, VA 20169
     (540) 341-8808 (telephone)
20   (540) 341-8809 (facsimile)

21
     Dallin Holt*
22   dholt@holtzmanvogel.com
     HOLTZMAN VOGEL BARAN
23   TORCHINSKY & JOSEFIAK, PLLC
     2555 East Camelback Rd, Ste 700
24   Phoenix, AZ 85016
     (602) 388-1262 (telephone)
25   (540) 341-8809 (facsimile)

26

27

28

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1473889.10 - 06297.00001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 19th day of December 2024, a true copy of the FIRST AMENDED CLASS ACTION COMPLAINT was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Daniel R. Paluch*
DANIEL R. PALUCH

FIRST AMENDED COMPLAINT
CASE NO. 2:24CV6253

1473889.10 - 06297.00000